## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MARTIQUE DAUGHTRY,                  :      Civil No. 3:17-cv-0442
                                    :
            Plaintiff,              :
                                    :
      v.                            :
                                    :
SUPT. KAUFFMAN, *et al.*,           :
                                    :
            Defendants.             :      Judge Jennifer P. Wilson

## <u>MEMORANDUM</u>

Plaintiff Martique Daughtry has filed First and Eighth Amendment claims

against Defendants Kauffman, Bisor, Chism, Wakefield, Whitesel, Grove, Goss,

Bard, Carini, Locke, Reed, Hoy, Ruiz, Parson, Brennan, and Pasquelly arising

from events in 2015 at the Smithfield State Correctional Institution ("SCI-

Smithfield"), in Huntingdon, Pennsylvania.  Before the court is Defendants'

motion for summary judgment.  (Doc. 70.)  For the reasons that follow,

Defendants' motion for summary judgment will be granted.

### BACKGROUND AND PROCEDURAL HISTORY

On March 3, 2017, Martique Daughtry ("Plaintiff" or "Daughtry"), a self-

represented individual, filed this action pursuant to 42 U.S.C. § 1983 concerning

events that transpired at his former institution, SCI-Smithfield, in 2015.[1]  (Doc. 1.)

Daughtry names the following current and former SCI-Smithfield employees as

---

[1] Plaintiff is currently housed at SCI-Fayette, in Labelle, Pennsylvania.

defendants:  Superintendent ("Supt.") Kauffman; Deputy Whitesel; Deputy
Wakefield; Major Chism; CCPM Bisor; Captain ("Capt.") Goss; Lieutenant ("Lt.")
Allison; Major Grove; Captain Allison; Captain ("Capt.") Allison; Lt. Bard; Unit
Manager ("UM") Grove; Counselor Pasquelly; Sergeant ("Sgt.") Reed; Lt. Carini;
Sgt. Hoy; Corrections Officer ("CO") Ruiz; CO Locke; CO Parson and CO
Brennan.

The court construes Daughtry's complaint as asserting three counts.  In
Count I, Daughtry alleges that Defendants Pasquelly, Goss, Allison, Bard,
Kauffman, Wakefield, Whitesel, Reid, Chism, Bisor, and Grove violated the
Eighth Amendment by failing to protect him from assault in March and June 2015.
In Count II, Daughtry claims Defendants Carini, Hoy, Parson, Brennan, Ruiz, and
Locke violated the Eighth Amendment on March 12, 2015, when they used
excessive force against him upon entering his Restricted Housing Unit ("RHU")
cell.  In Count III, Plaintiff claims Defendant Grove directed others to retaliate
against him in violation of the First Amendment because he filed grievances.

After the close of discovery, the Defendants filed a motion for summary
judgment, supporting brief, statement of facts, and exhibits.  (Docs. 70-72.)  After
filing a handwritten opposition to Defendant's motion and supporting exhibits,
Doc. 75, Plaintiff sought, and was granted, leave to file a "more legible typed
brief" in opposition to Defendants' motion.  (Docs. 76, 77.)  Daughtry's

submission included a response to Defendants' statement of facts, opposition brief, and supporting exhibits.  (Doc. 78.)  Defendants filed a reply brief on July 27, 2020 that, *inter alia*, noted Daughtry's failure to admit or deny Defendants' statement of material facts as required by Pa. M.D. Local Rule 56.1.  (Doc. 79.)  Without first obtaining leave of court, Daughtry filed a sur reply brief and amended handwritten response to Defendants' statement of facts referencing documents in the record. (Docs. 80, 82.)  Defendants' motion is now fully briefed and ripe for disposition.

## JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1331, which allows a district court to exercise subject matter jurisdiction in civil cases arising under the Constitution, laws, or treaties of the United States.  Further, venue is appropriate because the action detailed in the complaint occurred in the Middle District of Pennsylvania.

## STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is not precluded by "[f]actual disputes that are irrelevant or unnecessary."  *Id.*  "A

dispute is genuine if a reasonable trier-of-fact could find in favor of the nonmovant and material if it could affect the outcome of the case." *Thomas v. Tice*, 943 F.3d 145, 149 (3d Cir. 2019) (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)). The court may not "weigh the evidence" or "determine the truth of the matter." *Anderson*, 477 U.S. at 249. Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but, instead, 'must set forth specific facts showing that

there is a genuine issue for trial.  Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## MATERIAL FACTS

The following facts are undisputed or, where disputed, reflect Daughtry's version of the facts, pursuant to the court's duty to view all facts and reasonable inferences in the light most favorable to the nonmoving party. *Peroza-Benitez v. Smith*, 994 F,3d 157, 164 (3d Cir. 2021) (quoting *Santini v. Fuentes*, 795 F.3d 410, 419 (3d Cir. 2015)).

### A.    Daughtry's Allegations

On January 12, 2015, while housed on SCI-Smithfield's A-Block, Daughtry was approached by another inmate who accused him of killing his brother.  (Doc. 1, ¶ 1.)[2]  Three days later, Daughtry stated that he took "self lock up to avoid an altercation[,] nothing in particular[,] I just having issues at home that's all."  (Doc. 71-1, p. 16.)[3]  A week later, while still confined in the RHU under administrative custody, Counselor Pasquelly asked Daughtry to name the inmate that threatened him.  Daughtry was unable to provide a name.  (Doc. 1, ¶ 3.)  On January 20, 2015, Daughtry was unable to provide Capt. Goss, Lt. Allison, and Lt. Bard the name of the inmate he feared.  Daughtry also advised them that "it was going to be a problem if he was released back into general population."  (*Id*., ¶¶ 4–5.)  Daughtry stated he did not "want to start no trouble but if [he] [was] released to [general population] and is confronted by this individual [he would] do whatever [he had] to do to remain safe."  (Doc. 71-1, p. 52.)  The only information Plaintiff provided staff was that he believed the inmate "lives on I Block."  (Doc. 1, ¶ 13.)   The PRC returned Daughtry to general population on January 22, 2015.  (*Id*., ¶ 16.)  For nearly two months, Daughtry was housed in general population, first on EB-Block and then A-Block, without incident.  (*Id*., ¶¶ 16, 19.)

---

[2] Although Daughtry references various exhibits in his complaint, they were not provided to the court.  *See* Doc. 1.

[3] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

On March 9, 2015, Daughtry again heard "rumors" from "v[a]rious sources that there was a hit out on [his] life and that gym (sic) from I block was the one who was behind it the same inmate who a[c]cussed Plaintiff of killing his brother and threaten[ed] plaintiff's life." (*Id.*, ¶ 20.)  On the evening of March 11, 2015, while in his A-Block cell, Daughtry alleges that someone "struck [him] in the back of the head with a very hard object."  (*Id.*, ¶ 23.)  Daughtry was transported to an outside hospital for evaluation and received seven stitches for a laceration to his forearm.  (*Id.*, ¶ 25.)  On March 12, 2015, Defendants Allison and Goss spoke to Daughtry in the infirmary and attempted to learn the name of the individual who harmed him.  (*Id.*, ¶ 28.)  Daughtry stated he "didn't get a look at him my back was to the door."  (*Id.*)  Following his release from the infirmary Daughtry was again placed in the RHU under administrative custody status.  (*Id.*, ¶29.)

Daughtry was placed in cell KA20.  (*Id.*, ¶ 30.)  On the evening of March 12, 2015, Daughtry pushed his call button to get medical and psychological help.  (*Id.*)  A brief time later, Defendants Carini, Hoy, Parson, Brennan, Ruiz, and Locke charged into his cell unannounced.  CO Locke violently slammed the entry shield down on Plaintiff while CO Ruiz grabbed his hands and Sgt. Hoy shackled his feet.  Sgt. Hoy asked whether they should cut off Plaintiff's clothing.  Lt. Carini told him to wait until a nurse arrived.  (*Id.*, ¶¶ 30–34.)  Daughtry told the arriving nurse that staff had just assaulted him and he "thinks that they are trying to isolate [him] so

that they can kill [him]." (*Id.*, ¶ 35.)  As Sgt. Hoy started to cut Daughtry's clothing off, the nurse stopped him and directed that Daughtry be transferred to a psychiatric observation cell ("POR").  (*Id.*, ¶¶ 34–36.)

On March 14, 2015, Defendants Brennan and Ruiz escorted Daughtry to complete an inventory of his property.  (*Id.*, ¶¶ 29, 38.)  A Sony Walkman belonging to another inmate was discovered in Daughtry's property.  Because the item did not belong to Daughtry and it was found in his property, he was issued a misconduct for the possession of contraband.  (*Id.*, ¶ 38, Doc. 71-3, p. 2.)

On March 20, 2015, while housed in the POC, Defendant Goss and others asked Daughtry to identify the inmate who harmed him.  Daughtry indicated he did not know as he was hit from behind.  (*Id.*, ¶ 39.)  Plaintiff was released to general population, K-Block, later that day.  (*Id.*, ¶ 40.)

On April 2, 2015, Daughtry was again placed in the RHU in response to his correspondence to prison officials and others that he feared for his life.  (*Id.*, ¶¶ 51–47.)  Security staff again spoke to Daughtry seeking to learn more of his reasoning for requesting self-confinement.  On April 9, 2015, Pennsylvania State Police ("PSP") Trooper ("Tpr.") Swank interviewed Daughtry.  (*Id.*, ¶ 60.)  He told Tpr. Swank that he "was informed by Marices that the person who threatened" him on January 12, 2015 was "Jim." (*Id.*, ¶¶ 20, 60.)  Later that day, for the first time, Daughtry provided this information to Defendants.  (*Id.*, ¶¶ 60-62.)  Daughtry

remained in the RHU while his claims were investigated by the Pennsylvania Department of Corrections ("DOC") Office of Special Investigations and Intelligence ("OSII"). (*Id*., ¶¶ 65, 68, 73–74, 77–78.)

On June 25, 2015, Daughtry was released back to general population. (*Id*., ¶ 83.) He learned on June 26, 2015, "that there was another hit being put out on him." (*Id.*, ¶ 84.) Later that day, Daughtry returned to the RHU after getting into an altercation with an inmate in the general population yard. (*Id*., ¶¶ 84–85.) Prison staff made several efforts to transfer Daughtry to a different institution. He remained in the RHU until his eventual transfer. (*Id*., ¶¶ 86–89.) In July 2015, Daughtry claims RHU staff at the direction of Defendant Gove "burnt Plaintiff for razor[s], food and showers etc. for a period of a week … to try and stop Plaintiff from filing grievances." (*Id.*, ¶¶ 95–96.)

### B. OSII Investigation 2015-A-2018

The DOC investigated Daughtry's concerns that Defendants failed to protect him from assault by another inmate and that CO Locke assaulted him. (Doc. 71-1, pp. 1–65.) Based on their investigation, staff determined that Daughtry manufactured the threat against his safety and that his March 11, 2015 injuries were self-inflicted. (*Id*., p. 6.) Additionally, no evidence was discovered to support Daughtry's claim that CO Locke assaulted him with the insert shield or that Sgt. Hoy attempted to cut his clothes off on March 12, 2015. (*Id*., p. 7.)

On January 15, 2015, the prison's security office received credible information from another inmate that Daughtry was trying to "pull a stunt" to go to the RHU to see his brother and "leave the jail." (*Id*., pp. 26–27.) The inmate provided prison officials a handwritten note by Daughtry instructing the inmate to write an anonymous request slip that an altercation against Daughtry was imminent and should be investigated by staff. (*Id*., pp. 25–27.) The security office also received an anonymous request slip from F-Block stating that Daughtry killed his brother and prison officials had three days to remove him from population. (*Id*., pp. 17, 26.)

On January 20, 2015, Daughtry wrote to Superintendent Kauffman claiming that staff were trying to pressure him to provide the name of the general population inmate who threatened him. (*Id*., p. 54.) He claims staff is "tryna (sic) make the situation wors[e] by putting this dude out there and then be labled (sic) as a rat on the compound and still have to deal with all his hommies (sic). I'll take the heat before I tell on someone." (*Id*., p. 54.) The same day, Daughtry signed a witness statement indicating he "dont (sic) want to start no trouble but if [he is] released to pop and is confronted by this individual [he] will do whatever [he] ha[s] to do to remain safe." (*Id*., p. 52.) The next day, January 21, 2015, security staff interviewed Daughtry. (*Id*., p. 26; *see also* Doc. 62, ¶ 31.) When asked, Daughtry did not provide security staff with the name of the inmate who threatened him.

(Doc. 71-1, p. 26.)  Based on their information, security staff felt Daughtry was lying about the incident and recommended his release to population with no housing unit restrictions.  (*Id*., pp. 26–27.)

On March 11, 2015, nearly two months later, Daughtry was found lying on the floor in his general population cell, face down.  (*Id*., p. 40.)  Following the event, the security office interviewed seventeen inmates, who all stated that they did not see anyone enter Daughtry's cell or assault him.  They also reported not "hear[ing] any commotion coming from the cell and most stated that if radios and TVs were knocked over, they would have heard it."  (*Id*., pp. 28–31; Doc. 75-1, p. 60.)  Daughtry's cellmate was unaware of him having any issues on the block. (Doc. 71-1, p. 28.)  Staff interviewed Daughtry twice during the investigation. Based on their findings, the security staff believed the incident on March 11, 2015 to be "self-inflicted."  (Doc. 71-1, pp. 28–31.)

Following the incident on March 11, 2015, Daughtry was placed in the RHU.  (*Id*., p. 10.)  Daughtry claims he was suffering from head trauma at the time "to the point [he] attempted suicide.  [He] didn't know what was going on" when staff responded to his RHU cell.  (Doc. 75-1, p. 61.)  Staff responded to Daughtry's cell after he covered his cell door and was unresponsive to staff inquiries as to his well-being. (Doc. 71-1, p. 10.)  Closed circuit video footage of the RHU housing unit as well as handheld video (with audio) of staff entering Daughtry's cell were

considered during the investigation into Daughtry's allegations of staff abuse and are part of the record.[4]

A review of the video submissions[5] reveals the following occurred the afternoon of Thursday, Mach 12, 2015:  On two separate occasions, within minutes apart, staff stopped briefly at Daughtry's KA20 RHU cell door.  Five minutes later, at approximately 5:40 p.m., staff assembled prepared to enter Daughtry's cell to "check on the inmate's wellbeing."  When staff accessed Plaintiff's cell, a sheet was hanging in the doorway.  An officer carrying a shield is the first to enter the cell.  Daughtry is seen lying face up on his bunk.  There is a five second interval where the exact position of the shield cannot be seen.  Otherwise, the officer is clearly visible holding the shield above Daughtry.  The shield is in the cell for 22 seconds and is removed once Daughtry is fully restrained.  Staff turn Daughtry over, or face down, on his bunk to restrain him.

At no time while the officers are in Daughtry's cell does he cry out in pain or demonstrate any reflexive defensive position in response to the officer's physical contact with him.  Daughtry was silent and did not speak or respond to

---

[4] In cases where pertinent events are captured on video, courts should not rely merely on the parties' characterization of the events but rather should view the facts are they are depicted by the video. *Scott v. Harris*, 550 U.S. 372, 380-81 (2007).  If, viewing the evidence in the light most favorable to a plaintiff, no reasonable fact finder could view the video of the incident and determine that the defendants acted maliciously and sadistically, summary judgment is appropriate. *Tindell v. Beard*, 351 F. App'x 591, 596 (3d Cir. 2009).

[5] The handheld camera video includes audio.

staff.  Staff did not talk to or otherwise engage Daughtry.  There is no staff discussion concerning whether to remove Daughtry's orange jumpsuit.  There are no visible attempts by anyone to remove Daughtry's clothing.  Medical was called to respond to Daughtry's cell within moments of staff entering it.  No sudden or jerky movements are made by Daughtry or staff during the nine-minute wait for the nurse to arrive.

When the nurse arrived,[6] staff advised her that they entered Daughtry's cell to check on him after he covered his cell door and would not respond to them. After inquiring whether he was being recorded, and receiving an affirmative response, Daughtry spoke for the first time telling the nurse that his earlier request to staff to see "psych" was denied.  The nurse confirmed that "psych" was not available and that he needed to speak with her.  Plaintiff advised that he did not feel safe on the unit and believed staff were trying to set him up to harm him. Daughtry stated he did not know why he was in the RHU.  After Daughtry stated, "If they going to kill me, I'm going to do it myself," a decision was made to move him to the POC.  Daughtry never stated to the nurse that staff assaulted him, that he was hit with the shield, or suffered any injuries due to his interaction with staff. At that point Daughtry's feet were unshackled.  Twelve minutes after staff entered

---

[6] This nurse was familiar with Daughtry as she responded to his general population cell the day before when he was sent to the hospital.

Daughtry's cell, they assisted him to his feet, and he walked out of his cell without any assistance or visible injury. Daughtry was wearing his slides/shoes and orange jumpsuit as he was escorted out of the RHU.

Security staff escorted Daughtry outside and to the POC. Escorting staff did not speak to Daughtry and Daughtry did not speak to staff. The group arrived at the POC unit a few minutes later. As the group entered the unit, an officer asked Daughtry if he would comply with the strip search. Plaintiff asked if the camera was still on. Staff responded affirmatively. Staff asked Daughtry two more times if he would comply with the strip search. Daughtry questioned if the nurse was still there, she responded affirmatively. Daughtry was placed in strip cell and his handcuffs removed without incident. Without prompting, Daughtry disrobed and passed his slides/shoes, boxers, and jumpsuit to the officer through the wicket in the door. Daughtry followed the officer's direction throughout the visual strip search, but did not respond to the officer's questions. The officer then provided Daughtry special POC clothing and re-applied Plaintiff's handcuffs while the strip search cell door was opened to allow the nurse to photograph Daughtry. Daughtry was silent and compliant during this process and while transferred from the strip search cell to POC cell 3. The handheld video recording concludes with a debriefing of "the welfare check of inmate Daughtry." Staff indicated that Daughtry was not resistant at any time during the event.

14

At the conclusion of Captain Echenlaub's investigation, which included a review of both videos, and various interviews, he determined the investigation did not substantiate any of Daughtry's allegations and closed the matter.  (Doc. 71-1, p. 7.)

### C.      Misconduct No. 602069 Issued March 14, 2015

On March 14, 2015, CO Brennan and CO Ruiz inventoried Daughtry's property.  A Sony Walkman bearing another inmate's name and number were found in Daughtry's property.  The other inmate's named had been scratched out and Daughtry's name and number were engraved above it.  Daughtry's master inventory sheet did not reflect he previously owned a Sony Walkman.  Daughtry was issued a Class I misconduct for the possession of contraband and for damaging, destroying, or altering property.  *See* Doc. 71-3, p. 2.  At a March 18, 2015 misconduct hearing, Daughtry denied any knowledge of the Walkman and claimed he was "set up."  (*Id.*, p. 3.)  He claimed the misconduct was retaliatory and staff were trying to "kill" him.  (*Id.*, p. 4.)  The Hearing Examiner, relying on CO Brennan's report, found a preponderance of the evidence supported the charge of possession of contraband.  The other charge was dismissed.  As a penalty, the contraband was confiscated.  (*Id.*)

Daughtry appealed the misconduct to the Program Review Committee ("PRC").  (*Id.*, p. 6.)  The sole issue raised by Daughtry was his desire to have the

misconduct dropped "to a class two informal" charge because he did not receive "any type of sanction beside[s] the revoke (sic) of contraband." (*Id*., p. 6.) The PCR denied the appeal noting that "possession of another inmate's property and attempting to conceal the identity of the owner by falsely engraving a different name on the item is a serious infraction." (*Id*., p. 5.) Finding no compelling reason to reduce the class of the misconduct, Daughtry's appeal was denied. (*Id*.) Defendants Biser and Whitesel made up two of the three-member PRC panel addressing Daughtry's misconduct appeal. (*Id*.)

### D.   Daughtry's July 2015 Grievances

On June 30, 2015, Daughtry filed Grievance 574397-15. (Doc. 71-4, p. 10.) In the grievance, Daughtry claims prison officials have been negligent and deliberately indifferent to his claim that his life was in danger. (*Id.*) He also claimed he had been "harassed to the point of suicide."[7] (*Id.*) The grievance was denied at initial review. (*Id.*, p. 9.) Daughtry filed an appeal to the facility manager on July 20, 2015. (*Id.*, pp. 7–8.) Superintendent Kauffman denied the appeal. (*Id.*, p. 6.) Plaintiff filed an appeal to final review. (*Id.*, pp. 4–5.) At final review, Daughtry stated he has been in the RHU since April 2, 2015 "and wasn't (sic) having problems until [he] wrote Grove up on 6/30/15." (*Id.*, p. 4.) He states

---

[7] On June 27, 2015, Daughtry attempted to hang himself with his sheets. (Doc. 78-4, p. 3.)

that on July 10, 2015, after being released from a short stay in the POC, the RHU

escorting staff told him "they were grinding [him] up" at the direction of UM

Grove because he filed grievances against Grove.[8]  (*Id.*)  The grievance was denied

at final review on August 17, 2015.  (*Id.*, p. 3.)

On July 10, 2015, Daughtry filed Grievance 576748-15 alleging CO Parsons

and others were harassing him and trying to provoke an altercation with him

because he continued to file grievances against staff.  (*Id.*, pp. 41–42.)  After

receiving an extension of time to file a response, the grievance was denied on

November 8, 2015 by Lt. Allison.  (*Id.*, p. 40.)  Daughtry, now at SCI-Forest, filed

an appeal to the Superintendent on December 2, 2015, noting that he had just

received his property after his transfer from SCI-Smithfield.  (*Id.*, p. 39.)

Superintendent Kauffman denied the grievance appeal on December 17, 2015.

(*Id.*, p. 38.)

Daughtry filed Grievance No. 576741 on July 12, 2015 claiming CO Taylor

and Defendant Parsons threw away his mail on July 10, 2015, and "burnt" him for

his razor the following day.  CO Taylor allegedly told Daughtry he would not

receive a razor until he stopped "snitching" which Plaintiff understood as stop

filing grievances.  (Doc. 71-4, p. 30.)   On July 12, 2015, CO Taylor told other

---

[8] Daughtry was placed in the POC on July 8, 201 and again on July 16, 2015 after attempting to commit suicide by tying a sheet around his neck.  (Doc. 78-4, pp. 13, 38.)

officers that Daughtry did not "deserve no paperwork." (*Id.*, p. 30.)  The grievance

was denied on July 28, 2015.  (*Id.*, p. 28.)  Daughtry filed an appeal to the

Superintendent on August 3, 2015.  (*Id.*, pp. 26–27.)  Superintendent Kauffman

denied the grievance appeal on August 13, 2015.  (*Id.*, p. 25.)  Daughtry filed an

appeal to final review the following day.  (*Id.*, p. 23–24.)  The grievance was

denied on September 22, 2015 as untimely filed.  (*Id.*, p. 25.)  However, it was

reopened on October 16, 2015 after it was noted that Daughtry was committed to a

mental health facility for a period.[9]  (Doc. 78-4, p. 29.)

On July 26, 2015, Daughtry filed grievance 5778130-15 stating RHU

officers, including Defendant Parsons, continued to harass him by withholding a

meal tray, denying him the opportunity to shower, and refusing to give him a razor.

(*Id.*, p. 39.)  The grievance was denied by Defendant Grove on August 10, 2015.

Grove stated unit records reflected he refused to shower on July 20, 2015 and July

24, 2015.  He was not provided a razor on July 21, 2015 or July 25, 2015 due to his

verbal abuse of staff.  On July 25, 2015, CO Taylor did not provide Daughtry a

meal tray because he would not step to the back of his RHU cell as required to

receive a tray.  Daughtry filed an appeal to Superintendent Kauffman on August

10, 2015.  (*Id.*, pp. 43–44.)  The appeal was denied on August 20, 2015.  (*Id.*, p.

---

[9] Pursuant to Section 303 of the Mental Health Procedures Act, Daughtry was committed to an inpatient mental health unit for a period of 20 days.  (Doc. 78-4, pp. 49–55.)

45.)  Daughtry filed an appeal to final review.  (*Id.*, pp. 46–47.)  The grievance

appeal was denied by the DOC's Chief Grievance Officer on October 9, 2015.

(*Id.*, p. 48.)

## DISCUSSION

### A.    Failure to Protect Claim

The Eighth Amendment, which prohibits cruel and unusual punishment,

requires prison officials to take reasonable measures "to protect prisoners from

violence at the hands of other prisoners."  *Farmer v. Brennan*, 511 U.S. 825, 832

(1994).  However, not every harm suffered because of prisoner-on-prisoner

violence translates into a constitutional violation by prison officials responsible for

the victim's safety.  *Farmer*, 511 U.S. at 834.

Eighth Amendment claims have an objective and subjective component.  To

state a cognizable Eighth Amendment failure to protect claim, a plaintiff must

demonstrate that: (1) he was incarcerated under conditions posing substantial risk

of serious harm (objective component); (2) the official was deliberately indifferent

to that substantial risk (subjective component); and (3) the official's deliberate

indifference caused his harm.  *Proctor v. James*, 811 F. App'x 125, 128 (3d Cir.

2020); *Farmer*, 511 U.S. at 834–38; *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir.

1997)).  "[T]he proof necessary to show that there was a substantial risk of harm is

less demanding than the proof needed to show that there was a probable risk of

harm." *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 373 (3d Cir. 2019).

The subjective component of an Eighth Amendment claim requires a showing that

the defendant was deliberately indifferent.  As such, the court must "focus [on]

what a defendant's mental attitude actually was (or is), rather than what it should

have been (or should be)."  *Hamilton*, 117 F.3d at 747.  "A prison official's

knowledge of a substantial risk is a question of fact and can, of course, be proved

circumstantial evidence."  *Id.*  In other words, actual knowledge may be inferred in

situations where the general danger was obvious.  *See Farmer*, 511 U.S. at 842.

For instance,

> [I]f an Eighth Amendment plaintiff presents evidence
> showing that a substantial risk of inmate attacks was
> 'longstanding, pervasive, well-documented, or expressly
> noted by prison officials in the past,' and the
> circumstances suggest that the defendant-official being
> sued had been exposed to information concerning the risk
> and thus 'must have known' about it, then such evidence
> could be sufficient to permit a trier of fact to find that the
> defendant-official had actual knowledge of the risk.

*Farmer*, 511 U.S. at 842–43 (quotations omitted).  Moreover, a prison official who

responds reasonably to a known risk of harm to an inmate will not be found liable,

even if the harm is ultimately not averted.  *See Farmer*, 511 U.S. at 844; *Beers-

Capitol v. Whetzel*, 256 F.3d 120, 132 (3d Cir. 2001).

To survive Defendants' summary judgment motion, Daughtry must point to evidence in the record that Defendants both knew of and were deliberately indifferent to an excessive risk to his safety. *Beers-Capitol*, 256 F.3d at 133.

Plaintiff argues that Defendants' receipt of the anonymous letter threatening his life in conjunction with his reporting of the encounter with the unknown I-Block inmate prior to his alleged assault is sufficient to establish Defendant's actual knowledge of a significant risk to his safety. (Doc. 78-1.)

The uncontroverted record before the court demonstrates that Defendants took reasonable measures to protect Daughtry from harm based on the information presented concerning Daughtry's allegation of a threat to his physical well-being. It is not disputed that Daughtry made a non-specific statement that he sought self-lock up in the RHU "to avoid an altercation nothing in particular I'm just having issues at home that's all." (Doc. 71-1, p. 16.) Defendants immediately granted his request. (*Id.*, 55.)

Daughtry later advised prison officials that an unnamed inmate from I-Block believed Daughtry killed his brother and threatened to kill him. That is all the information related by Daughtry concerning the alleged threat and the individual who threatened him. While Plaintiff was in self-confinement, Defendants were not idle, rather they investigated Daughtry's claim. The security office received "credible information" that Daughtry was trying to scam the institution to be

21

transferred to the RHU to see his brother and manufacture a reason for his transfer to another facility.  Evidence of this scam emerged from diverse sources.  An inmate "turned in" a handwritten note believed to be from Daughtry instructing another inmate to anonymously put in "jone" in on "the 13th" and tell prison authorities that "something crazy is about to go down" with Daughtry that should be investigated.  (*Id*., p. 25.0)  Language in the letter purported to be written by Daughtry instructs the recipient to tell the "South Philly Bunch on F Block … [Daughtry] said put that jone in ASAP."  (*Id*.)  The security office also received an anonymous request slip from F-Block stating Daughtry had killed his brother and warned prison officials they had three days to get Daughtry out of general population before he was harmed.  (*Id*., 17.)  Based on this information and an interview with Daughtry himself, Intelligence Captain Defendant Goss, believed Daughtry was "lying about the incident" and "recommend[ed] that Daughtry be released to population with no housing unit restrictions."  (*Id*., pp. 26–27.) Daughtry has not presented any evidence to contradict the information relied upon by Defendants at the time of releasing him to general population.

While Daughtry argues that this same information corroborates his claim that someone from I-Block threatened to kill him, it does not show Defendants operated with the requisite mindset to demonstrate their deliberate indifference to a serious risk to his safety.  The information confirms that security officials found

the anonymous letter, the letter believed to be written by Daughtry, and the information provided by the other inmate to be more credible than Daughtry's version of events.  Absent further evidence of Defendants' culpable state of mind, Daughtry has not demonstrated that Defendants' actions of releasing him to general population or otherwise relying upon Defendant Goss' report that Defendants both knew of and intentionally disregarded an excessive risk to his safety.

To the extent that Daughtry claims that he attempted to tell Defendant Reid about the resurgence of rumored threats to his life on the afternoon of the alleged assault, but Defendant Reid dismissed his concerns, this fails to demonstrate Defendant Reid's deliberate indifference to Plaintiff's safety.  At best, this conduct suggests that Lt. Reid was negligent in failing to take additional time to listen to him amid managing inmates coming in from afternoon yard at the same time. Without more, a jury could not infer from this conduct that Defendant Reid intentionally disregarded a serious risk to Plaintiff's safety.  Additionally, Daughtry does not allege Reid was the only officer on the unit at that time or that he could not have advised another officer of his concerns.  This finding is underscored by the fact that Daughtry learned the first name of the inmate from I-Block on March 9, 2015, two days before he attempted to express concern to Defendant Reid as he was coming in from yard.  Yet Daughtry did not share that

information with any prison official, let alone Lt. Reid, for over a month–even after he was allegedly assaulted on March 11, 2015.  (Doc. 1, ¶¶ 20–21, 60.)

The uncontradicted facts do not establish that Defendants knew of a pervasive risk to Daughtry and disregarded that risk.  Instead, the record demonstrates that Defendants made reasonable efforts to ensure Plaintiff's safety after he reported being threatened by an unidentified I-Block inmate.  Daughtry has failed to demonstrate that he faced a pervasive risk of serious harm when he was released to general population in January 2015 or March 2015.  The court will grant Defendants' motion for summary judgment with respect to Plaintiff's failure to protect Eighth Amendment claim.

## B.     Excessive Use of Force Claim

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments," U.S. CONST. amend. VIII, and protects prisoners from the "unnecessary and wanton infliction of pain."  *Whitley v. Albers*, 475 U.S. 312, 319 (1986).  When prison officials use excessive force against prisoners, they violate the inmates' Eighth Amendment right to be free from cruel and unusual punishment.  *Hudson v. McMillian,* 503 U.S. 1, 6–7 (1992).  As noted above, all Eighth Amendment claims have an objective and subjective component.  *Hudson*, 503 U.S. at 8.  In evaluating the subjective component of an excessive force claim, the court considers "whether force was applied in good-faith effort to maintain or

restore discipline, or maliciously and sadistically to cause harm." *Ricks v. Shover*,
891 F.3d 468, 480 (3d Cir. 2018) (citations omitted).

The factors used to determine whether the force applied was excessive
include: "(1) the need for application of force; (2) the relationship between the
need and the amount of force used; (3) the extent of the injury inflicted; (4) the
extent of the threat to the safety of staff and inmates, as reasonably perceived by
responsible officials on the basis of the facts known to them; and (5) any efforts
made to temper the severity of a forceful response." *Brooks v. Kyler*, 204 F.3d
102, 106 (3d Cir. 2000) (quotation marks and citation omitted).

Not "every malevolent touch by a prison guard gives rise to a federal cause
of action." *Hudson*, 503 U.S. at 9. "The Eighth Amendment's prohibition of cruel
and unusual punishments necessarily excludes from constitutional recognition *de
minimis* uses of physical force, provided that the use of force is not of a sort
repugnant to the conscience of mankind." *Id.* at 9–10. An inmate who complains
of a "push or shove" that causes no discernible injury almost certainly fails to state
a valid excessive force claim. *Id.* (citing *Johnson v. Glick*, 481 F.2d 1028, 1033
(2d Cir. 1973)). However, the "core judicial inquiry" is not whether a certain
quantum of injury was sustained, but rather "whether force was applied in a good-
faith effort to maintain or restore discipline, or maliciously and sadistically to
cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010); *see also Hudson*, 503 U.S.

25

at 7.  "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation."  *Wilkins*, 559 U.S. at 37.

To overcome Defendants' motion for summary judgment as to his excessive force claim Daughtry must demonstrate that more than *de minimis* force was used, not applied in good-faith effort to maintain or restore discipline, but that it was maliciously and sadistically used to cause harm.  Daughtry has not met this burden.

Daughtry claims Defendants Carini, Hoy, Parson, Brennan, Ruiz, and Locke used excessive force when they entered his RHU cell on March 12, 2015, and CO Locke "violently slammed [a] shield down on him."  (Doc. 1, ¶¶ 30–36.)  The parties do not dispute that the identified Defendants entered Daughtry's RHU cell on March 12, 2015.  Daughtry admits that earlier that day he pushed his in-cell call button and requested to speak with someone from the "Psych" department and staff "denied" his request. The parties do not dispute that CO Locke had a shield in his possession upon entering Daughtry's cell, or that it was removed once the other officers placed Daughtry in restraints.  Daughtry does not assert that any officer other than CO Locke used excessive force against him upon entering his RHU cell. (*Id*.)  The parties part ways as to whether the entry into Daughtry's RHU cell itself under these circumstances was an excessive use of force, and whether CO Locke "violently slammed" the entry shield against Plaintiff upon entering the cell.

26

Generally, the court is required to take the facts in the light most favorable to the plaintiff.  However, when a video of the underlying incident is in the record, the court need not rely on a plaintiff's description of the facts where the record discredits that description and should instead "consider the facts in the light depicted by the videotape."  *Scott*, 550 U.S. at 381.  Plaintiff's allegation that CO Locke maliciously and sadistically used force against him by "violently slamming" him with the shield is refuted by the handheld video and audio recording of the incident.  Daughtry's statement that he did not cover his RHU door with a sheet, prompting staff to enter his cell to check on his well-being, is also dispelled by the handheld video.

The video demonstrates that Daughtry covered the window to his RHU cell. CO Locke had the entry shield in Daughtry's cell for approximately 22 seconds. All but 5 seconds of that time is visually accounted for on the video.  However, during these 5 seconds, CO Locke is visible and the audio of the events in the cell is clearly discernable.  Daughtry lays passively on his bunk the entire time the officers are in his cell.  He does not speak, cry out, or utter any sounds indicating he experienced any discomfort or pain because of any of the officer's actions, including CO Locke.  He is not seen to reflexively wince, jerk, or otherwise recoil from Defendants.  There is no discussion amongst Defendants about whether Daughtry's clothing should be removed, and there is no indication that anyone

tried to remove his clothing.  When the nurse arrived upon the scene, and after he

verified that the camera was recording his interactions, he did not allege that CO

Locke or any of the officers injured him.  He did, however, indicate that he did not

feel safe in the RHU and that the officers were trying to kill him and he could be

heard saying, "I'm going to do it myself."  Plaintiff's leg shackles were removed,

and he walked to the POC under his own power.  Daughtry was fully dressed in his

orange jumpsuit when leaving the RHU.

Upon entering the POC strip cell, Daughtry does not exhibit pain,

discomfort, or an inability to remove his shoes, jumpsuit, and boxers.  Aside from

the injury to his arm received the day before, there are no new discernable injuries

on Daughtry's body visible on the video from in the RHU cell or the POC strip

search cell.

In sum, the record demonstrates that to the extent force was used, i.e. the

Defendants entered Daughtry's cell and held an entry shield above him until

restrained, it was *de minimis*.  The summary judgment evidence also established

that the force was applied in a good faith and not maliciously and sadistically to

cause him harm.  The Defendants' decision to conduct a welfare check on

Daughtry was necessitated by Daughtry's own actions.  Early that day, Daughtry

had previously requested to see "Psych," which was unavailable.  In addition, he

covered his cell door window with a sheet, which was against prison rules and

impeded the officer's ability to visually evaluate him.  Daughtry refused to

verbally communicate with staff, placing his well-being at issue.  The handheld

camera's audio and video as well as the RHU's fixed cameras do not support

Daughtry's version of the events.  Because no reasonable juror reviewing the

videos and the record as a whole could find that CO Locke, or any other Defendant

who entered his cell on March 12, 2015, used excessive force against him,

Defendants are entitled to summary judgment on this claim as well.

### C.    Retaliation

To state a First Amendment claim of retaliation, a plaintiff must demonstrate

that: (1) he engaged in constitutionally protected conduct; (2) he suffered an

adverse action at the hands of the prison officials; and (3) his constitutionally

protected conduct was a substantial or motivating factor in the decision to take the

adverse action.  *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016) (citing *Rauser

v. Horn*, 241 F.3d 330, 333–34 (3d Cir. 2001)).  To establish the second

requirement, the prisoner must demonstrate "that the action 'was sufficient to deter

a person of ordinary firmness from exercising his [constitutional] rights.'"  *Rauser*,

241 F.3d at 333 (quoting *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000)).

An adverse action "need not be great in order to be actionable; rather, it need only

be more than *de minimis*."  *Watson*, 834 F.3d at 423 (quoting *McKee v. Hart*, 436

F.3d a65, 170 (3d Cir. 2006) (internal quotation marks omitted).  To show a causal

link, the third requisite element, a plaintiff typically is required to prove either "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link." *Watson*, 834 F.3d at 422.  If neither is proven, the prisoner "must show that, from the 'evidence gleaned from the record as a whole,' the trier of fact should infer causation." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)).

If a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the prison officials to advance a legitimate, non-retaliatory reason for taking the adverse action.  In other words, prison officials must establish that "they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Rauser*, 241 F.3d at 334.  "This is often referred to as the 'same decision defense.'" *Watson*, 834 F.3d at 422.  If prison officials can make this showing, it defeats the retaliation claim.  *See Carter v. McGrady*, 292 F.3d 152, 159 (3d Cir. 2002).  When analyzing a retaliation claim, it must be recognized that the task of prison administrators and staff is difficult and the decisions of prison officials require deference, particularly where prison security is concerned.  *Rauser*, 241 F.3d at 334.

### 1.  Retaliatory Misconduct Claim

An allegation that a prison official filed a false disciplinary charge in retaliation for an inmate's filing of a grievance states a First Amendment claim of retaliation.  *See Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003) (retaliation "for filing complaints" violated the First Amendment) (citing with approval *Babcock v. White*, 102 F.3d 267, 275–76 (7th Cir. 1996) (stating that retaliation claims can be based on an inmate's lawsuit or prison grievance)).  Even where a prisoner sets forth a *prima facie* case of the issuance of a retaliatory misconduct, and the burden shifts to the defendants to demonstrate they would have made the same decision absent the protected conduct, *Rauser*, 241 F.3d at 334, the court must "evaluate … 'the quantum of evidence' of the misconduct to determine whether the prison officials' decision to discipline an inmate for his violations of prison policy was within the broad discretion … afford[ed] [to] them."  *Watson*, 834, F.3d at 426.  The Third Circuit Court of Appeals has noted that "most prisoners' retaliation claims will fail if the misconduct charges are supported by the evidence."  *Id*. at 425; *see also*, *Alexander v. Fritch*, 396 F. App'x 867, 874 (3d Cir. 2010) (nonprecedential) (holding that "because there was evidence to support the hearing examiner's finding of guilty, there was a legitimate penological reason for the charge and punishment").

In this case, judged against the foregoing standards, the court finds that Daughtry has failed to present sufficient evidence to create a material dispute of

fact that CO Brennan issued him the misconduct for contraband in retaliation for his filing of grievances against other staff members.  The evidence of record discredits Daughtry's claim.  A Sony Walkman, appearing to belong to another inmate, was found in Daughtry's property.  It did not appear on his property inventory sheet.  Daughtry disavowed any knowledge of the Walkman and told the Hearing Examiner he thought he was "set up."  (Doc. 71-3, pp. 2–3.)  Daughtry was found guilty based on CO Brennan's report that the Walkman was found in Daughtry's property.  (*Id.*, p. 3.)  The penalty imposed by the Hearing Examiner was limited to the revocation of the contraband.  (Doc. 72, ¶ 48.)  Although Daughtry now claims he never saw the Walkman in his property, he never raised that issue at his hearing or in his misconduct appeal.[10]  (Doc. 71-3, pp. 3–4.) Daughtry's appeal to the PRC was limited to his request to have the offense severity of the misconduct downgraded from a Class I offense to a Class II offense. The PRC declined Daughtry's invitation to do so because the theft of another's property, and the attempt to conceal it, "is a serious infraction" within the prison setting.  (*Id*, p. 5.)

---

[10]  Under the Prison Litigation Reform Act ("PLRA"), a prisoner complaining about the conditions of his confinement must exhaust available administrative remedies before filing a suit in federal court.  42 U.S.C. § 1997e(a).  The exhaustion requirement is mandatory.  *See Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007).  Thus, presuming for the purposes of this argument only that Daughtry properly complied with the DOC's exhaustion requirements concerning his misconduct appeal, this claim is unexhausted because he clearly did not challenge the hearing examiner's determination based on his current disbelief that the Walkman was actually found in his property.

Based on the discovery of the Walkman in Daughtry's property with the altered name and identification of another inmate, as well as the absence of a Walkman on Daughtry's property records, the court finds there is a sufficient quantum of evidence of a serious rules infraction to demonstrate that CO Brennan's issuance of the misconduct was reasonably related to legitimate penological interests and that Daughtry would have received the misconduct regardless of his grievances. *See Watson*, 834 F.3d at 426. "Quite simply, Plaintiff 'was punished for disobeying prison rules.'" *Flynn v. Dep't of Corr.*, No. 3:12-CV-1535, 2021 WL 134206 (M.D. Pa. Jan. 14, 2021) (quoting *Quiero v. Ott*, 799 F. App'x 144, 146 (3d Cir. 2020)). Consequently, the court will grant summary judgment to Defendants with respect to Plaintiff's First Amendment retaliation claim related to the March 14, 2015 misconduct.

## 2. Retaliatory Denial of Showers, Razors, and Meals while in the RHU

Daughtry argues that at the direction of Defendant Grove, CO Parson, and others "burnt Plaintiff for razor[s], food and showers [etc.] for a period of a week for no penalogical (sic) reason other then (sic) to provoke Plaintiff into an aultercation (sic) and to try and stop Plaintiff from filing grievances." (Doc. 1, ¶ 95.) Defendants admit that the filing of grievances is constitutionally protected conduct and that "there appears to be a causal connection between Daughtry's filing of grievances and the actions he claims were taken against him." (Doc. 71,

p. 24.)  Thus, Defendants only dispute the adverse action element of Daughtry's retaliation claim.  Specifically, Defendants argue that Daughtry has not demonstrated that he suffered an adverse action with regards to the deprivation of showers, a razor, or meals "sufficient to deter a person of ordinary firmness from exercising his constitutional rights."  (*Id.*)  Additionally, Defendants claim that each alleged deprivation of a meal, razor, or shower grievance was investigated by prison officials and "it was consistently determined that Daughtry's behavior while in the RHU was less than appropriate," implying that the adverse action was driven by Daughtry's own actions and not to retaliate against him.  (*Id.*).

As detailed above with respect to the grievances filed by Daughtry, the record reveals that in July 2015, Daughtry grieved the denial of razors, meals, and showers while housed in the RHU.  Defendants aver that on July 11, 2015, Daughtry was not provided a razor because he was "verbally abusive to staff and that due to [his] actions, the wicket was not opened to give [Plaintiff] a razor." (Doc. 71-4, p. 20.)  Next, Daughtry offers the affidavit of another inmate who was present in the RHU and overheard Plaintiff stating he was denied a shower on July 20, 2015.  (*Id.*, p. 52; Doc. 75-2, p. 1, Oliver Aff.)  Defendants counter that Plaintiff was offered the opportunity to shower on July 20th and 24th but declined. (Doc. 71-4, p. 50.)

Then, Daughtry alleges that retaliation occurred because of the grievances he filed based on the alleged incidents in the RHU.  On July 21, 2015, Daughtry states he was not given a razor in retaliation for his filing of grievances.  (*Id*.)  Daughtry again offers the affidavit of a fellow RHU inmate who witnessed Defendant Parson on July 21, 2015 telling Daughtry he would only receive a meal if he said he would not file any more grievances against RHU staff.  (*Id.*; Doc. 75-2, p. 2, Covine Aff.*)* Daughtry received his meal after complying with CO Parson's demand.  (Doc. 71-4, p. 52.)  Finally, Daughtry claims he was denied a meal on July 26, 2015 at the direction of Defendant Parsons.  (*Id*., p. 52; Doc. 75-2, p. 1.)[11]

Even viewing the facts in the light most favorable to Plaintiff, the court finds that the retaliatory deprivation of a razor on one occasion, and retaliatory deprivation of two meals are, quite simply, *de minimis*.  Accordingly, Defendants' motion for summary judgment as to this claim of retaliation is granted.

## CONCLUSION

---

[11] Daughtry submits an affidavit of inmate Yafest Oliver, Doc. 75-2, p. 1, that states this event occurred on July 27, 2015.

For the reasons set forth above, the court will grant summary judgment in favor of Defendants as to all of Daughtry's claims.  An appropriate order will issue.

s/ Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated:  September 30, 2021